Joey Darrell **FAUST**, Appellant

v.

The **STATE** of Texas

Ramon **Marroquin**, Appellant

v.

The State of Texas

NO. PD–0893–14
NO. PD–0894–14

Court of Criminal Appeals of Texas.

DELIVERED: December 9, 2015

Rehearing Denied June 15, 2016

16. *Id.* at 805.

17. *Id.*

James S. Sharpe, Fort Worth, TX, for Appellants.

Charles M. Mallin, Assistant District Attorney, Fort Worth, TX, Lisa C. McMinn, State's Attorney, Austin, for the State.

## *OPINION*

Richardson, J., delivered the opinion of the Court in which Meyers, Johnson, Keasler, Hervey, and Alcala, JJ., joined.

On October 6, 2012, appellants, Joey Darrell Faust and Ramon Marroquin, while protesting at a gay pride parade, each disobeyed a police officer's order to not cross a skirmish line, resulting in their arrest for the offense of Interference with Public Duties under Texas Penal Code Section 38.15(a)(1).[1] After a consolidated bench trial, each appellant was convicted and sentenced to two days' confinement in the Tarrant County Jail and assessed a $286 fine. Appellants appealed their convictions, asserting that Section 38.15(a)(1) had been unconstitutionally applied to them in violation of their First Amendment rights.[2] The Second Court of Appeals agreed with appellants and reversed their convictions. For the reasons discussed herein, we hold that Section 38.15(a)(1) was not unconstitutionally applied to appellants. Therefore, we reverse the decision of the Second Court of Appeals, and we order that the trial court judgments be reinstated.

## *BACKGROUND*

Appellants, Faust and Marroquin, along with several other members of the Kingdom Baptist Church, were protesting at a

---

1. Tex. Penal Code § 38.15(a)(1) provides that "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." It is uncontroverted that appellants heard and purposely disobeyed the police officers' order.

2. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, ... or the right of the people peaceably to assemble...." U.S. Const., amend. I. The First Amendment right to freedom of speech applies to the states by virtue of the Fourteenth Amendment. *See Ex parte Thompson*, 442 S.W.3d 325, 334 (Tex. Crim.App.2014).

gay pride parade in downtown Fort Worth. Members of the Kingdom Baptist Church had a history of being involved in physical altercations at previous gay pride parades. Having been informed of such history of violence, the Fort Worth Police Department assigned several teams of police officers from the Zero Tolerance Unit as tactical response to control the crowd, maintain peace, and handle any physical altercations that might occur. Sergeant Paul Genualdo headed one of the tactical response teams.

Sergeant Genualdo testified during the bench trial that he first came in contact with Faust before the parade started. He asked Faust and the Kingdom Baptist Church members to join with other protesters to "have them in one area so they could still do their demonstration but just co-locate them." Sergeant Genualdo testified that the purpose of controlling the groups was "[t]o prevent a breach of the peace." He said that they "were trying to make sure that there were no physical altercations that took place." When he first asked Faust if his group would move, Faust "declined," and Sergeant Genualdo said "okay." Sergeant Genualdo then moved along with his team to another location along the parade route where they "maintain[ed their] position throughout the duration of the parade as it went by." Sergeant Genualdo testified that, as the end of the parade was passing the officers, there were "some crowds of civilians" walking down Main Street behind the parade. At that time, Sergeant Rachel De-

Hoyos and Lieutenant Glen Verrett ordered Team One and Team Five to form a police skirmish line. The officers' intent was to block off the southbound direction on Main Street in order to temporarily prevent the Kingdom Baptist Church members from going further south. The police were trying to "maintain a space" between the church members and the "trail end" of people supporting the parade in order to avoid any confrontation that could escalate into violence between the two groups. Sergeant Genualdo emphasized that the skirmish line "was not intended to be permanent." He stated that it was "a delay and [the church members] were going to be allowed to proceed southbound once we determined there was a safe time distance between the two."

Appellant Faust encountered Sergeant Genualdo at the skirmish line. Sergeant Genualdo testified that he "held out his arms and told [Faust] he couldn't proceed any further for the time being."[3] Faust asked Sergeant Genualdo if he was being detained, and Sergeant Genualdo told Faust that he was not being detained, and that he was free to proceed in any direction other than southbound down Main Street "at that time."[4] Sergeant Genualdo then testified that Faust "began to physically berate [him], told [him] that [he] was working for a lesbian, told [him] that [he] needed to put earrings and a bow in [his] hair," and referred to Sergeant Genualdo as "a fag."[5] Faust told Sergeant

**3.** Appellants have placed great emphasis on the argument that the police officers did not communicate the temporary nature of the skirmish line to appellants, leaving them to interpret the skirmish line as a permanent suppression of their right to continue to communicate their views to the parade-goers. However, Sergeant Genualdo's testimony that he told Faust that they were being delayed "for the time being" is indicative that the temporary nature of the skirmish line was indeed communicated to Faust.

**4.** Again, Sergeant Genualdo communicated that the skirmish line would be temporary.

**5.** Other than this brief mention during Sergeant Genualdo's testimony that he was being "physically berated," there was no evidence to suggest that Faust had any physical contact with Sergeant Genualdo. Faust was not charged with assaulting a police officer.

Genualdo that "he was going to cross the line and [Sergeant Genualdo] had better not try to stop him or he was going to sue [him]." Faust then crossed "two or three feet past the skirmish line into the street," at which time Sergeant Genualdo placed Faust under arrest for Interference with Public Duties and charged him with violating Texas Penal Code Section 38.15(a)(1). Although neither appellant was charged with Disorderly Conduct, Officer Genualdo testified that he believed that language used by Faust violated the Disorderly Conduct statute and was indicative of the language that Faust had used throughout the day.[6] Officer Genualdo testified that he was not concerned about Faust expressing his religious views. Rather, Officer Genualdo's testimony reflected his belief that Faust would likely direct the same type of language toward the parade supporters that he had used toward Officer Genualdo, which, in Officer Genualdo's mind, was language that was prohibited under the Disorderly Conduct statute because it would have likely incited violence.

On cross examination, Faust's counsel established that other people were allowed to cross the skirmish line, but Faust was not. Sergeant Genualdo explained that this was "due to the previous history the department has experienced with [Faust]," and that "the likelihood for violence was increased if [Faust] went and met with the trail end of the parade." The officers wanted to "prevent that from occurring."

Sergeant DeHoyos testified that there were altercations between the Kingdom Baptist Church protestors and the parade supporters and participants after last year's gay pride parade. In her police report, which was offered into evidence by appellants as Defense Exhibit 1, Sergeant DeHoyos described the history of violence involving the Kingdom Baptist Church members:

> I worked the event last year and was present and observed several breaches of the peace caused by these individuals. These protestors were a group from Kingdom Baptist Church in Venus, Tx. They had extreme anti-homosexual views and yelled and screamed disparaging remarks at the persons attending the Gay Pride Parade. Examples that I heard were: "I hope you and your children die in a fiery crash" and "you should just go ahead and kill yourself you faggot!" Some of the statements uttered last year did provoke violence and incited at least one physical fight. Two other arrests were made when they used offensive language.[7]

> I also had previous knowledge that these persons from Kingdom Baptist church often come to downtown Fort Worth on Friday and Saturday nights and "street preach." They are well known and documented to use foul, abusive and offensive language which by its very utterance tends to incite an immediate breach of the peace. In some cases, the foul, abusive and offensive language is directed toward individuals whom they believe are homosexuals. As a result of these actions, one of their members was arrested for Assault Bodily Injury/Hate Crime Enhancement.

6. TEX. PENAL CODE § 42.01(a)(1) provides that "[a] person commits an offense if he intentionally or knowingly: (1) uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace."

7. Sergeant DeHoyos testified at trial that she, too, believed the words used by the Kingdom Baptist Church members in protest at the prior year's gay pride parade were words that were likely to incite the immediate breach of the peace in violation of the disorderly conduct laws.

In her police report, Sergeant DeHoyos also described how appellants were interfering with the police officers' exercise of their duties during this year's gay pride parade:

... During the parade, the Kingdom Baptist Church group stayed in the 100–300 blocks of Main St. We received numerous complaints from persons attending the parade about the hateful speeches being uttered by this group but at this time they were complying with the law and were not violating any city ordinances.

When the parade ended, the majority of the persons attending the parade began to walk South on Main St. towards the area where the festival was being held. From my experience last year, I knew that this was when the majority of the volatile conflicts occurred between the Kingdom Baptist Church group and the persons who were attending the parade. In order to keep a breach of the peace from occurring and to ensure the safety of both the parade attendees and the Kingdom Baptist Church group, I ordered Zero Tolerance Officers to form a skirmish line at 300 Main and keep the Kingdom Baptist Church group away from the parade attendees.

... I initially had four officers on the east side of the street and had to call for additional ZT Officers as the Kingdom Baptist Church group was attempting to push through our skirmish line. ARR1/Marroquin and another unidentified black male stepped off the curb line and were physically attempting to push through the line. I had to push them back and told them to get back on the curb. Marroquin continually attempted to break through the line, and I had to push him back at least four times. Officer Medders, Officer Gray and Officer Johnson also had to push him back. Marroquin kept asking if he was being detained and I told him he was not detained, but he could not walk past me. I told him he could walk back the other direction. I told him if he went past me I could not guarantee his safety, he told me "I didn't ask you to watch for my safety" and attempted to walk past me and I pushed him back again. Marroquin again attempted to push past myself and Officer Gray by forcing his shoulder between the two of us. This action was interfering and disrupting me from exercising and performing my duty to keep a breach of the peace from occurring as imposed by law. I then arrested ARR1/Marroquin for Interference with Public Duties of a Peace Officer.

Shortly after this occurred, Sergeant Genualdo encountered ARR2/Foust [*sic*] on the West side of the street. Sergeant Genualdo told me that Foust [*sic*] tried to cross the street southbound. Sergeant Genualdo told him he could not go any further.... Sergeant Genualdo told him that he couldn't guarantee his safety if he did. Foust [*sic*] said, "I didn't ask you to do that." ... Genualdo told him he could not cross and had to extend his arm to keep Foust [*sic*] from passing. Foust [*sic*] then said "I'm only going to let you detain me for a few more minutes and then you arrest me if you want to." Foust [*sic*] then attempted to walk past Sergeant Genualdo. This action was interfering and disrupting Sergeant Genualdo from exercising and performing his duty to keep a breach of the peace from occurring as imposed by law.

Sergeant DeHoyos testified that it was not their intention "to prevent anyone from expressing Christian views or any type of religious views." They were simply "attempting to prevent a breach of the peace, mainly being disorderly conduct, or in a worst-case scenario, riot." The skirmish line was implemented, based on past

and current conduct of the members of the Kingdom Baptist Church, because the officers were concerned for the safety of both the protestors and the parade supporters and participants.[8] Sergeant DeHoyos stated that, because of the problems appellants and other members of the Kingdom Baptist Church caused the year before, at that same location, the police were trying to prevent commingling of the people attending the parade and the Kingdom Baptist Church protestors so that they could avoid any physical altercations. She explained,

> I wasn't so concerned about once they got to the 900 block, because last year we were able to contain them fairly well and just had to endure the constant aberration [sic]. But it's that—that gap from where we held them initially to the 900, so basically those six blocks, my concern was in those six blocks, what would happen there because that's where the problems occurred the previous year. That's where, as they were commingling, you had people attending the festival and the parade and you had people from the Kingdom Baptist

Church, as they were both moving down, that's where the altercation occurred and that's what we were trying to prevent.

Sergeant DeHoyos testified at trial that Marroquin tried to cross the row of police officers by attempting to push through the skirmish line. When Marroquin tried to push his way across the skirmish line, he, too, was arrested for Interference With Public Duties in violation of Section 38.15(a)(1).

At the close of the State's evidence the State rested, and then the defense rested. At that time appellants' defense counsel presented to the trial court a Motion for Judgment, along with a Memorandum Brief in support of such motion. In their brief, appellants acknowledged that "[a]n 'applied' challenge to a law can only be brought 'during or after a trial on the merits.' "[9] Appellants urged the following arguments before the trial court: (1) prior events are not a basis for "prior restraint" of speech;[10] (2) apprehension of disturbance is not enough to overcome the right to freedom of expression;[11] (3) where "pri-

---

**8.** Sergeant DeHoyos testified that the police were concerned about protecting "not only the parade-goers, but the protestors themselves," because there was the "possibility of violence being used against them also."

**9.** Defendant's Memorandum Brief at 2 (citing to *State of Texas v. Fine*, 330 S.W.3d 904, 910 (Tex.Crim.App.2011)).

**10.** *Id.* at 6 (citing to *Carroll v. President of Princess Anne*, 393 U.S. 175, 180, 182, 185, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)). *Carroll* involved a lawsuit brought by the county and the town to restrain members of a political party from holding rallies. The Supreme Court set aside the ten-day order imposing the restraint, but not because the Court addressed "the thorny problem of whether, on the facts of this case, an injunction against the announced rally could be justified." The Court acknowledged that prior restraints on protected speech bears "a heavy presumption against its constitutional validity." However,

the Court also noted that this presumption can be overcome with the proper "procedural safeguards designed to obviate the dangers of a censorship system."

**11.** *Id.* at 7 (citing to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). *Tinker* involved a lawsuit seeking an injunction against enforcement by school officials of a regulation prohibiting the wearing of black armbands by students in protest of the Vietnam War. The Court noted that "apprehension of disturbance is not enough to overcome the right to freedom of expression." Under the facts of that case, we would agree. The "apprehension of disturbance" under the facts of *Tinker* is notably different from the police officers' concern for public safety based on the church members' history of violence that was present in this case.

or similar activity led to or involved instances of violence," the "law is clear that First Amendment activity may not be barred;"[12] (4) Government is "to punish it [wrong conduct] after it occurs rather than to prevent the First Amendment Activity;"[13] and (5) the proper way for government to deal with "potential and actual violence is for government to ensure an adequate police presence ... and to arrest those who actually engage in such conduct, rather than suppress legitimate First Amendment conduct as a prophylactic measure."[14] Appellants' counsel argued orally that "arresting them for attempting to cross the street when other members of the public were permitted is absolutely unconstitutional." Appellants' counsel concluded by arguing that, as to each appellant, "this was an unconstitutional arrest and the charges that have been brought are based on an unconstitutional application of this statute to these facts." In response, the State argued that "the officers were performing a lawful duty, trying to prevent a breach of the peace. These defendants both have a history of inciting a breach of the peace at this very parade in the past couple of years and the officers were trying to maintain order and peace."

The trial court denied appellants' Motion for Judgment and found both Faust and Marroquin guilty of the offense of interference with public duties. Before sentencing Appellants, the trial court judge explained his ruling as follows:

> I want to start by saying that I am not a person who will sit up here and defend a police state. I don't think that's what we had here. I like for the police to follow the rules that everyone else does. I have probably granted more motions to suppress in cases, maybe than any other judge in this courthouse, because of that. However, I think the police in this case, in your cases, were performing a legitimate function, and it is not my intention here to say that you and your group cannot express your views. You're certainly protected by law in that expression of views, whatever it is. I don't see this as a free-speech case, I see this as a maintaining public order case. We've got to have rules in our society or it's going to be chaos. And I'm not going to sit here and say, well, gosh, we should wait until there's a brawl in the street before the police take

12. *Id.* (citing to *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir.1996)). *Collins* involved a class action lawsuit brought against police officials by those arrested for demonstrating after the Rodney King verdict was announced. The plaintiffs' First Amendment claims were to the effect that the police had unlawfully banned all demonstrations and unlawfully arrested those who refused to disperse. The court held that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations on the following day. Again, this case is distinguishable on the facts. *Collins* involved a complete ban on expressive activity. That was not what occurred here. Appellants were not banned from expressing their views. The prior history of violence was relevant information that caused the police to, rightfully, be on heightened alert. It was only near the end of the parade route—after appellants had been allowed to fully voice their views in protest throughout the duration of the gay pride parade—that the police decided to temporarily create a time and space separation between two groups in their effort to keep the peace. As we explain herein, such restriction fell within the noted exception allowing for such restraint. In fact, the court in *Collins* acknowledged that, under certain circumstances, a "time-limited ban" could be lawful, depending on whether the police had "reliable information that organized violence of a serious nature is about to occur."

13. *Id.* (citing to *Collins*, 110 F.3d at 1371–72).

14. *Id.* at 9 (citing to *Collins*, 110 F.3d at 1372).

action, because we don't want that. You can't stand up in the middle of a crowded theatre and yell fire for that very reason. There's got to be order in our society or we don't have society anymore. So that's the approach I'm taking on y'all's cases.

## THE COURT OF APPEALS' DECISION

Appellants' sole issue raised on direct appeal was that "they were detained based on speculation of the content of their future speech in violation of their First Amendment rights," and thus Section 38.15(a)(1) was unconstitutionally applied to them.[15] The Second Court of Appeals agreed, finding that, "[b]y targeting the Kingdom Baptist Church members for restraint based solely on their history of violence induced by their abusive speech, the police officers necessarily implicated the group's First Amendment rights."[16] The appellate court held that the police skirmish line was an unconstitutional infringement upon appellants' right of free speech. The appellate court held that, "[t]he prohibition against crossing the skirmish line 'must be judged against the stringent standards we have established for restrictions on speech in traditional public fora.'"[17] The court further noted that "[b]ecause the skirmish line was directed at the possible secondary effects of the church group's speech, we look to whether the skirmish line was narrowly tailored to serve a significant government interest."[18] The appellate court held that the police skirmish line "was not narrowly tailored to serve the government's interest in public safety."[19] The appellate court believed that precluding all members of the church from exercising their First Amendment rights based on their affiliation with the church was "far too broad a limitation."[20] Although agreeing that the police were not required to wait until violence erupted before stepping in, the court of appeals found that "there must have been some indication that the public's safety was at risk beyond the history of one assault by a member of the organization who may not even have been present at the time the skirmish line was in place."[21] The court of appeals reversed the appellants' convictions. It held that, by restricting appellants from crossing the police skirmish line due to their status as members of the Kingdom Baptist Church, while allowing other members of the public who were not members of the church to cross the line, the police officers acted in violation of appellants' First Amendment rights. Thus, said the court, arresting appellants for Interference with Public Duties when they disobeyed the police orders to not cross the skirmish line was an unconstitutional application of Section 38.15(a)(1).

15. *Faust v. State*, Nos. 02–13–00222–CR, 02–13–00223–CR, 2014 WL 2611186, at *2 (Tex. App.–Fort Worth June 12, 2014) (mem. op., not designated for publication).

16. *Id.*

17. *Faust*, 2014 WL 2611186, at *2 (quoting *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)).

18. *Id.* at *3 (citing to *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

19. *Id.* at *3 (noting that "[a]ll members of the church were barred from proceeding down the street regardless of whether they had previously assaulted parade-goers or not, whether they were yelling profanity or threatening words or not, or whether they were even protesting at all").

20. *Id.* at *4 (citing to *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

21. *Id.* at *4.

## THE STATE'S PETITION AND THE ARGUMENTS OF THE PARTIES

We granted the State's petition for discretionary review to address whether the court of appeals erred in determining that the police officers' skirmish line had been ordered in violation of appellants' First Amendment rights, and thus appellants' conviction for disobeying such an order was an unconstitutional application of Section 38.15(a)(1).[22]

Appellants seek to have this Court uphold the decision of the Second Court of Appeals, arguing that the conduct of the police in precluding appellants from crossing the skirmish line, while letting other members of the public cross said line, was an unconstitutional infringement upon appellants' rights of free speech and assembly. Appellants claim that because the skirmish line had no lawful purpose, the application of Section 38.15(a)(1) to crossing the skirmish line was unconstitutional.[23]

The State asserts that appellants' restraint under Section 38.15(a)(1) was pursuant to a valid, content-neutral regulation, and that appellants were not arrested because of their expressive activity, but as a result of their disobedient behavior and failure to comply with the lawful orders of law enforcement officers. The State argues that appellants had no right under the First Amendment to disobey the orders of law enforcement officers on the basis that the officers were acting in violation of appellants' constitutional rights.

## ANALYSIS

### The Constitutionality of Section 38.15(a)(1) "As Applied" to Appellants Depends Upon the Constitutionality of the Police Skirmish Line

 An "as applied" challenge to the constitutionality of a statute asserts that a statute, although generally constitutional, operates unconstitutionally as to the claimant because of his particular circumstances.[24] When reviewing the constitu-

---

**22.** The State's petition presents four grounds for review:

1. Did the Second Court of Appeals err in implicitly holding that citizens can use the First Amendment to the United States Constitution as a shield to disobey lawful orders of law enforcement and forcibly cross a police skirmish line set up at a gay pride parade in Fort Worth, Texas, when those measures by law enforcement are taken to preserve the peace and the safety of the public?

2. Notwithstanding that police action may infringe on a citizen's First Amendment rights, does a citizen have a right to disobey orders of a police officer, forcibly breach a skirmish line imposed, and interfere with the officer's duties?

3. Did the Second Court of Appeals err in failing to conduct a proper "as applied" First Amendment analysis when it concluded that the Fort Worth Police Department's action in constructing a skirmish line at a

gay pride parade violated the First Amendment to the United States Constitution?

4. Did the Second Court of Appeals err in concluding that the skirmish line set up by the police department during the Fort Worth Gay Pride Parade was not a reasonable action as to "time, place or manner" under the First Amendment to the United States Constitution?

**23.** "The issue in these cases is not and never has been the language of Section 38.15(a)(1). It has always been its application to crossing the skirmish line, which had no lawful purpose." Appellant's Brief on the Merits, at 12, *Faust v. State*, Nos. 02–13–00222–CR, 02–13–00223–CR, 2014 WL 2611186 (Tex.App.–Fort Worth June 12, 2014) (mem. op., not designated for publication).

**24.** *See State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex.Crim.App.2011); *Gillenwaters v. State*, 205 S.W.3d 534, 536 n.3 (Tex.Crim. App.2006).

tionality of a statute, we presume that the statute is valid and that the Legislature acted reasonably in enacting it.[25]

A person commits the offense of Interference With Public Duties under Section 38.15(a)(1) "... if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer *is performing a duty or exercising authority imposed or granted by law.*"[26] Appellants urge this Court to affirm the appellate court's decision that, since appellants were convicted under Section 38.15(a)(1) for interfering with a police skirmish line that violated their First Amendment rights and, as such, was not an order issued under authority "imposed or granted by law," Section 38.15(a)(1) was unconstitutionally applied to them.

■ We begin by examining more closely the language of Section 38.15(a)(1), as it applies to this case. Appellants were found guilty of interfering with the peace officers while they were "performing a duty or exercising authority imposed or granted by law." Peace officers have a duty, under Article 2.13 of the Texas Code of Criminal Procedure, "to preserve the peace within the officer's jurisdiction."[27] The testimony by Sergeants Genualdo and DeHoyos shows that the officers were performing such duty when they set up the skirmish line with the purpose of temporarily separating two groups with drastically conflicting views, and that appellants interfered with that duty when they disobeyed the officers by intentionally crossing the skirmish line after being told not to. In imposing a duty upon peace officers to "preserve the peace," Article 2.13 further cautions that, "to effect this purpose, the officer shall use all lawful means." Appellants' constitutional challenge is to the lawfulness of the means used by the police in performing their duty to preserve the peace—the skirmish line. That was the claim raised by appellants before the trial court, that was the claim raised and addressed on direct appeal, and that is the claim we address today.[28]

**25.** *Rodriguez v. State,* 93 S.W.3d 60, 69 (Tex. Crim.App.2002).

**26.** Tex. Penal Code § 38.15(a)(1) (emphasis added).

**27.** Tex.Code Crim. Proc. art. 2.13.

**28.** We do not perceive a preservation-of-error issue here. It has been clear from day one that appellants were raising a constitutional "as applied" challenge. Appellants argued before the trial court that they were challenging the constitutionality (i.e., the lawfulness) of the skirmish line, and they raised that claim on appeal. Had the trial court agreed with appellants and rendered a judgment of acquittal, perhaps the State could have raised a valid argument that its right to appeal should not be foreclosed by such a ruling; the trial court might have erred had it granted an acquittal, as opposed to a dismissal, since the basis for relief was a constitutional challenge. *See, e.g., Cain v. State,* 855 S.W.2d 714, 715 n. 2 (Tex.Crim.App.1993). *But see, Flores v. State,* 245 S.W.3d 432, 443 (Tex.Crim.App. 2008) (Cochran, J., concurring) ("There is

only one remedy for either the trial or appellate court: dismiss the indictment and enter an acquittal because the defendant was convicted under an unconstitutional application of an otherwise valid penal statute."). However, since the trial court did not enter an acquittal, that scenario is not before us.

In *Freeman v. State,* 340 S.W.3d 717, 730 (Tex.Crim.App.2011), the appellant raised an "as applied" constitutional challenge on appeal. This Court held that defendant's bare request for an acquittal, without articulating a reason, was not enough to preserve error of his constitutional claims. Appellant did not specify that his complaint was of the constitutionality of Texas Penal Code Section 19.03. *Id.* In this case, however, appellants' request for acquittal made at the close of all the evidence clearly and unambiguously articulated the basis for the relief sought from the trial court judge.

In *Resendez v. State,* 306 S.W.3d 308, 312–13 (Tex.Crim.App.2009), this Court held that "no technical considerations or forms of words" are required to preserve an error for appeal, and a party must only "be specific

■ Public streets and sidewalks are traditional public forums.[29] Picketing and marching, if peaceful and orderly, are entitled to First Amendment protection as methods of expression.[30] There is no dispute that appellants had a First Amendment right to express their views in a public forum. And, they were allowed to do so. The First Amendment forbids the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others.[31]

■ However, restrictions that have an effect on protected speech may nevertheless be allowed under certain circumstances. The Supreme Court has held that, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions 'are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.'"[32]

enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App.1992)). The trial court and the State understood the relief appellants were seeking and the basis for their claim for relief.

In this case, appellants did not specifically request an "instructed verdict." After the State closed, and after appellants rested, defense counsel brought a motion for judgment "finding that the arrest and prosecution under this law, as applied to these facts, they are not guilty." Therefore, we do not believe that there was a failure on appellants' part to preserve their right to appellate review of their constitutional "as applied" challenge.

29. *See Hill v. Colorado*, 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

30. *Gregory v. Chicago*, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (holding that convictions for Disorderly Conduct could not be sustained where defendants had not been disorderly). Appellants place great emphasis on the precedential value of the *Gregory* case. However, the defendants in *Gregory* were arrested for Disorderly Conduct with regard to the manner in which they held their demonstration. The Supreme Court made it clear that "[defendants] were charged and convicted for holding a demonstration, not for a refusal to obey a police officer." We find this distinction significant since, in this case, appellants *were* charged and convicted for refusal to obey a police officer.

31. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). The First Amendment prohibits laws that abridge freedom of speech. U.S. Const., amend. I. The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. *See Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).

32. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citing to *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Relying upon *Madsen v. Women's Health Center*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), the dissenting opinion views the police skirmish line as more of an injunction than a general statute or ordinance, which would mean that a more stringent application of general First Amendment principles should be applied. In *Madsen*, a civil action, the Supreme Court focused on the relief sought by the plaintiff. The Court drew a distinction between injunctions and statutes because injunctions "can be tailored by a trial judge to afford more precise relief." 512 U.S. at 765, 114 S.Ct. 2516. Its "close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech is consistent with the general rule, quite apart from First Amendment considerations, 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Id.* (internal citations omitted). Thus, said the Court, "our standard time, place, and manner analysis is not sufficiently rigorous." *Id.* In *Madsen*, using the stricter standard, the Court examined each contested provision of the court's injunction order to see if it burdened more speech than necessary to accomplish the valid gov-

We hold that the purported restriction in question here—the police skirmish line—was a reasonable restriction on the time, place, and manner of protected speech because the skirmish line met the above three requirements. Therefore, we hold that the temporary skirmish line was a lawful means to effect the police purpose of preserving the peace at the gay pride parade.[33]

ernmental interests of protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy, ensuring public safety and order, promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all citizens. The Supreme Court upheld some of the restrictions in the injunction order and struck down others as too broad. *Id.* at 776, 114 S.Ct. 2516. However, there is a distinction between analyzing First Amendment challenges to an injunction, which is a "judicial remed[y] for proven wrongdoing," *Id.* at 778, 114 S.Ct. 2516 (dissenting opinion, J. Stevens), and analyzing a First Amendment challenge to a police skirmish line, which is a government imposed restriction pursuant to statutory authority. In any event, even under the stricter *Madsen* standard, the police skirmish line did not burden more speech than necessary to accomplish its goal. The goal was to assure a peaceful end to the parade festivities by creating a temporary time gap between the Kingdom Baptist Church protestors, who were known to have caused violent confrontations at prior gay pride parades, and the trail end of the parade-goers and participants. The church members had been permitted to express their religious views along the parade route as the parade passed by them, and they would have been permitted to continue expressing their views once the potential for violent confrontations had diminished. The "burden" to the church members was a delay in their ability to communicate their message in all directions (they were permitted to go in any other direction other than one). Even under the *Madsen* standard, we would not find that speech was burdened more than necessary for the police to accomplish their goal.

**33.** We reviewed the appellate court's decision under the same assumption—that the officers were regulating protected speech. However, Sergeants Genualdo and DeHoyos both testified that they believed that appellants, while protesting at the gay pride parade, had used language that was not protected speech, but rather was language prohibited under the Disorderly Conduct statute. Although the officers did not arrest appellants for Disorderly Conduct, they expressed concern that, if appellants were allowed to proceed past the skirmish line and come in close contact with the parade-goers as they all gathered at the end of the parade, appellants were likely to use language that would tend to incite an immediate breach of the peace. Speech used in a "public place," that is "abusive, indecent, profane, or vulgar," and that, "by its very utterance tends to incite an immediate breach of the peace," is prohibited under the Disorderly Conduct statute, TEX. PENAL CODE § 42.01(a)(1). The government may prohibit speech or conduct which has a tendency to incite or produce immediate violence. *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (holding that New Hampshire's statute prohibiting "fighting words" in public forums was constitutional because "[a] statute punishing verbal acts, carefully drawn so as to not unduly impair liberty of expression, is not too vague for a criminal law."); *Cantwell v. Connecticut,* 310 U.S. 296, 309–10, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (holding that personal abuse and epithets were not "in any proper sense communication of information or opinion safeguarded by the Constitution and its punishment as a criminal act would raise no question under that instrument"). Although the specific language used by Faust, about which Sergeant Genualdo testified as the kind of speech tending to incite violence, came *after* he ordered Faust to not cross the skirmish line, Sergeant Genualdo also testified that such language was "indicative of [Faust's] behavior during the course of the day." The appellate court made the threshold decision that, because the officers would not allow the members of the Kingdom Baptist Church to go past the skirmish line, while allowing others who were not members of the Kingdom Baptist Church to proceed past the line, the officers implicated appellants' First Amendment rights. However, the motives of the police in setting up the skirmish line were not based on curtailing the church's message, but rather were directed toward maintaining public safety. Sergeant DeHoyos explained that if other parade-goers, not affiliated with the church, had been using "fighting words"

## 1. *Content Neutral*

In determining content neutrality, we look to whether the police order to not cross the skirmish line had the purpose of regulating appellants' speech "because of disagreement with the message it conveys."[34] The officers' purpose in setting up and enforcing the skirmish line is the controlling consideration.[35] A regulation that serves purposes unrelated to the content of the protected speech is deemed content neutral, "even if it has an incidental effect on some speakers or messages but not others."[36] In fact, regulations restricting speech are found to be content neutral when they are directed to the secondary effects of a speaker's conduct as opposed to the content of the speech itself.[37]

While any governmental attempt to censor appellants' expressions of their beliefs would raise serious First Amendment concerns, it is clear that the officers intended to prevent direct and close confrontation between appellants and the parade-goers in order to promote safety, not to stifle appellants' expressions of their beliefs. The officers' testimony showed they had no interest in imposing their own views on appellants. Their testimony reflects concern for the preservation of order and

protection of the public. The officers' concern for public safety extended only to the goal of ensuring that no violence would erupt between the Kingdom Baptist Church members and the parade supporters and participants. Therefore, we find that the skirmish line was content neutral, even though it may have had the incidental effect of temporarily hindering appellants' ability to deliver their message to the parade-goers.

The appellate court acknowledged that the police skirmish line was content neutral because of the officers' testimony that the skirmish line was set up due to concern for public safety. The court noted that, "[b]ecause the skirmish line was directed at the possible secondary effects of the church group's speech, we look to whether the skirmish line was narrowly tailored to serve a significant governmental interest."[38] We agree with this statement, hold that the skirmish line was content neutral, and next look to whether the skirmish line was narrowly tailored to serve a significant government interest.[39]

## 2. *Narrowly Tailored To Serve A Significant Governmental Interest*

A regulation is narrowly tailored if "the means chosen are not substantially broader than necessary to achieve the government's interest."[40] In

---

or "had been carrying signs or using speech that could incite violence," then those people would also be prohibited from crossing the skirmish line. Therefore, to the extent that the skirmish line was issued to prevent confrontations that might arise from appellants' use of speech tending to incite an immediate breach of the peace, and thus not protected under the First Amendment, such regulation does not implicate appellants' First Amendment rights.

**34.** *Id.*; *Hill v. Colorado*, 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting from *Ward*, 491 U.S. at 791, 109 S.Ct. 2746).

**35.** *Ward*, 491 U.S. at 791, 109 S.Ct. 2746.

**36.** *Id.* at 791, 109 S.Ct. 2746.

**37.** *City of Renton v. Playtime Theatres*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

**38.** *Faust*, at *2–3.

**39.** *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (holding that "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end").

**40.** *Ward*, 491 U.S. at 800, 109 S.Ct. 2746.

order to demonstrate that a challenged restriction is narrowly tailored, the government must demonstrate that the restriction "serve[s] a substantial state interest in 'a direct and effective way.' " [41] Absent such proof, a restriction may not be sustained if it provides only ineffective or remote support for the government's purpose.[42] Thus, a regulation is not narrowly tailored when it does not sufficiently serve those public interests that are urged as its justification.[43]

■ The appellate court held that the skirmish line was not narrowly tailored to serve the government's interest in public safety because all members of the Kingdom Baptist Church were barred from proceeding down the street merely because of their association with the church. However, we find that, while a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve

the government's legitimate, content-neutral interest, it need not be the least restrictive or least intrusive means of doing so.[44] Rather, the narrow tailoring requirement is met "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." [45]

■ The government has a significant interest in ensuring public safety and order.[46] "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." [47] Police officers have lawful authority to maintain public safety, particularly when crowds of people are gathered, and there is the perceived possibility of a riot or other threat to public safety.[48] A government must have some ability to protect from harm a speaker, the audience, and public and private property near the place of a potentially hostile speech environment.[49] The

41. *Edenfield v. Fane*, 507 U.S. 761, 773, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (citing to *Ward v. Rock Against Racism*, 491 U.S. at 800, 109 S.Ct. 2746).

42. *Id.* at 770, 113 S.Ct. 1792.

43. *United States v. Grace*, 461 U.S. 171, 181, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (noting that the section that totally banned the specified communicative activity on public sidewalks could not be justified as a "reasonable place restriction" because there was no sufficient nexus between the restriction and any public interest).

44. *Ward*, 491 U.S. at 798, 109 S.Ct. 2746.

45. *Id.* at 799, 109 S.Ct. 2746 (citing to *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

46. *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("As a general matter . . . a State's interest in

protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective."); *Schenck v. Pro–Choice Network of W. New York*, 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (noting that maintaining peace and public safety is a significant government interest).

47. *Hill v. Colorado*, 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

48. For example, Texas Penal Code § 42.03 provides that "a person commits an offense if, without legal privilege or authority, he intentionally, knowingly, or recklessly: (2) disobeys a reasonable request or order to move issued by a person the actor knows to be or is informed is a peace officer, a fireman, or a person with authority to control the use of the premises: . . . (B) to maintain public safety by dispersing those gathered in dangerous proximity to a fire, riot, or other hazard."

49. *See, e.g., Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 972 F.2d 365, 375 (D.C.Cir.1992) (noting that the "government must have some leeway to make adjustments necessary for the

Supreme Court has clearly expressed the importance of public safety in noting that, "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the State to prevent or punish is obvious." [50]

The officers' decision to prevent all members of the Kingdom Baptist Church from crossing the skirmish line was reasonable in light of the information they had received about previous instances of violent confrontations erupting between church members and gay pride parade supporters. [51] Officer DeHoyos was clear that the skirmish line was implemented because the officers were concerned for the safety of both the protestors and the

parade supporters and participants. [52] The officers' goal in preventing potentially dangerous confrontations had the highest probability of being achieved by creating a temporary separation of time and space between the two groups. Absent this physical separation, a nonviolent and peaceful end to the parade might not have been achieved. Moreover, the fact that a confrontation had not yet occurred is irrelevant. [53] The police officers were required to assess the situation, and their decision that it presented a potential danger, even though a confrontation had not yet occurred, was a reasonable one. Thus, we find that the police officers narrowly tailored the restriction to serve a significant governmental interest. [54] We next look to whether there were ample alternative

protection of participants, innocent onlookers, and others in the vicinity").

**50.** *See, e.g., Feiner v. New York,* 340 U.S. 315, 320–21, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (citing to *Cantwell v. Connecticut,* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

**51.** The court of appeals seems to have placed little emphasis on the history of violence exhibited by members of the Kingdom Baptist Church as a justification for the police skirmish line. The court of appeals's opinion mentioned such history of altercations only in general terms, and the court ultimately decided that an assault by one member in the past was not enough to justify the skirmish line. However, we find that there was more evidence to support the police perception of a looming threat than just one prior assault by one church member. Sergeant DeHoyos's testimony and police report recounted several instances when the church members were known to have made extremely disparaging remarks that could incite violence and spark a breach of the peace, not only at the prior year's parade, but on many Friday and Saturday nights in downtown Fort Worth.

**52.** *See Glasson v. City of Louisville,* 518 F.2d 899, 906–07 (6th Cir.1975) (noting that police officers have a duty to protect persons exercising the constitutional right of expression).

**53.** *See ACORN v. St. Louis County,* 930 F.2d 591, 596 ( 8th Cir.1991) ("The government need not wait for accidents to justify safety regulations.").

**54.** Citing to *Cox. v. Louisiana,* 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the dissent emphasizes that the possibility of violence between the protesters and the parade-goers was not sufficient to justify the skirmish line—the proper response to potential and actual violence is for the government to ensure an adequate police presence. Here, the police did in fact maintain a presence throughout the entire parade. And, although the temporary skirmish line was, at that particular time, more restrictive than mere police presence, it was a regulation on protected speech that was reasonable in time, manner, and place. The church members were not prohibited from continuing their protests, nor were they prohibited from espousing their views. The cases relied upon by the dissent involve complete suppression of speech, such as mass arrests of demonstrators who refused orders to completely disperse (*Collins v. Jordan,* 110 F.3d 1363 (9th Cir.1996)), and an ordinance making it unlawful to hold public worship meetings on the streets without a permit (*Kunz v. People of New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951)). This case does not involve anything close to such a blanket prohibition on protected speech.

channels of communication left open to appellants.

3. *Ample Alternative Channels Of Communication Open*

■ This final requirement is "easily met," so long as the guideline "continues to permit expressive activity" and "has no effect on the quantity or content of that expression."[55] The officers did not attempt to ban any particular manner or type of expression. They did not restrain appellants' movement in any direction except one.[56] The officers told appellants that they were free to proceed anywhere other than southbound at that time. Sergeant Genualdo's testimony indicated that he communicated to Faust that the skirmish line was "for the time being." Therefore, appellants were free to continue their protesting in all directions except for one, and would have been free to proceed down that restricted avenue after a temporary wait. We find that appellants had ample alternative channels of communication open to them.

### CONCLUSION

We therefore hold that the police skirmish line was a lawful exercise of police authority. Although it was a governmental restriction on protected speech, the skirmish line was reasonable because it was justified without reference to the content of the regulated speech, it was narrowly tailored to serve a significant governmental interest, and it left open ample alternative channels for communication of appellants' views. Therefore, we hold that the skirmish line did not violate appellants'

First Amendment rights. We agree with the sentiment expressed by the trial court judge—that appellants literally crossed the line, from engaging in purportedly protected speech, to physically interfering with a lawful police order. Therefore, we hold that Section 38.15(a)(1) was not unconstitutionally applied to appellants. We sustain the State's third and fourth grounds for review. In view of our disposition, we need not resolve the State's first two grounds. We reverse the decision of the court of appeals and order that the trial court's judgments be reinstated.

Johnson, J., filed a concurring opinion.
Yeary, J., filed a concurring opinion.
Keller, P.J., filed a dissenting opinion.
Newell, J., filed a dissenting opinion.

### CONCURRING OPINION

Johnson, J., filed a concurring opinion.

I am mindful of the extremely sensitive nature of constitutional issues that arise out of encounters between police officers who are acting under the color of their authority and private citizens. The Court's decision today—that Section 38.15 was not unconstitutionally applied to appellants—is based upon our finding that the police officers' exercise of authority was lawful. But, what if the police had set up a skirmish line that was not lawful? Could appellants have rightfully disregarded it?

Section 38.15 does not contain language that expressly provides for a peace officer's reasonable interpretation of his au-

---

55. *Ward v. Rock Against Racism*, 491 U.S. at 802, 109 S.Ct. 2746 ("Indeed, in this respect the guideline is far less restrictive than regulations we have upheld in other cases, for it does not attempt to ban any particular manner or type of expression at a given place or time.").

56. Sergeant DeHoyos testified repeatedly that "[t]hey couldn't cross the line—they couldn't cross that line, but you see me on video telling him he can go that way, which was back northbound, or he could have gone eastbound to Commerce Street and gone down Commerce street. He could not—I didn't want him going southbound on Main Street."

thority to perform his duties without interference. However, the legislature has addressed a similar issue by placing subsection (b) in Texas Penal Code section 38.03, which prohibits a person from resisting an arrest.[1] In *Gonzalez v. State*, 574 S.W.2d 135, 137 (Tex.Crim.App.1978), we held that "[r]egardless of whether [Gonzalez's] arrest was lawful or unlawful, the deputy constable was in the lawful discharge of his duty when he attempted to arrest [Gonzalez]." In *State v. Mayorga*, 901 S.W.2d 943, 945 (Tex.Crim.App. 1995) (citing *Barnett v. State*, 615 S.W.2d 220, 223 (Tex.Crim.App.1981)) (quoting *Ford v. State*, 538 S.W.2d 633, 635 (Tex. Crim.App.1976)), we stated, "Several states have eliminated either by statute or by judicial decision the common law right to resist an unlawful arrest. This reflects a growing realization that the use of self-help to prevent an unlawful arrest presents too great a threat to the safety of individuals and society to be sanctioned. The line between an illegal and legal arrest is too fine to be determined in a street confrontation; it is a question to be decided by the courts."

These policy reasons seem to support a similar limitation on a citizen's right to interfere with the reasonable exercise of police authority, regardless of the constitutionality of the purpose behind such interference. The issue of whether officers are exercising their lawful authority in enforcing a skirmish-line order should not be made by those intending to disobey that order. The societal interest in the orderly settlement of disputes between citizens and their government should arguably outweigh any individual interest in resisting a questionable police directive, particularly one as nonintrusive as a skirmish line. And, under current statutory law, we

should not craft such an exception when none is provided.

The remedy for citizens who believe that they have been arrested in violation of their constitutional rights lies in Title 42, section 1983, of the United States Code.[2] That statute provides, in pertinent part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, ... subjects ... any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress...." To obtain relief pursuant to Section 1983, a plaintiff must show that he was deprived of a right under the Constitution or laws of the United States by a person acting under color of state law. *Resident Council of Allen Parkway Vill. v. U.S. Dep't of Housing & Urban Dev.*, 980 F.2d 1043, 1050 (5th Cir.1993). The threshold question is whether the alleged facts show that the officer's conduct violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If a plaintiff shows that he had a clearly established right that was violated, the next inquiry is whether a reasonable official could have believed his conduct was lawful. *See, e.g., Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir.2007) (a reasonable officer would have known that he could not lawfully search the plaintiff's home); *see also Pritchard v. Downie*, 326 F.2d 323, 325 (8th Cir.1964) (dismissing complaint against police; marchers broke through police line, thus justifying a finding that conduct of some of the marchers was riotous and that, therefore, police could arrest them without violating their First Amendment rights). Only if the officer could not reasonably determine that

---

1. "It is no defense to prosecution [for resisting arrest] ... that the arrest or search was unlawful."

2. 42 U.S.C. § 1983: "Civil Action For Deprivation of Rights."

his actions were lawful is there injury of a constitutional dimension.

The First Amendment protects speech and expressive conduct. Crossing a street is neither speech nor, in this case, expressive conduct. Thus it is not subject to First Amendment protections. In this case, appellants were never prevented from crossing a street in order to go to the east, west, or north, and crossing a street in order to go south and harass parade marchers and watchers is not expressive conduct. Appellants' right to express their views by speech and expressive conduct was at all times unfettered, even when their expression of their views was laden with foul, abusive, and offensive language. Only where they could express those views was limited, and only temporarily. They were arrested, not for speech, but for interfering with public duties by failing to obey the lawful order of a police officer and for pushing one or more officers, acts without First Amendment ramifications.

I also note that nowhere in appellants' complaints is any mention of the First Amendment rights of the parade marchers and attendees. The old adage that says that my right to swing my fists ends at your nose applies here. The persons at whom appellants directed their invective may be shouted down by appellants, but they may not be physically abused by appellants under a claim of First Amendment rights. Given a known pattern of behavior by appellants and other members of their group, the police properly determined that, to prevent physical abuse of the marchers, the two groups must be kept a reasonable distance apart for a reasonable period of time. This principle has repeatedly been demonstrated and approved over decades as police formed skirmish lines to separate Klan members from civil-rights marchers in Montgomery, Alabama, Neo–Nazis from gatherings of Jewish holocaust survivors in Skokie, Illinois, and members of the Wista-ria Baptist Church from funeral services for fallen American warriors in a number of cities. I join the opinion of the Court.

### CONCURRING OPINION

Yeary, J., filed a concurring opinion.

Police have a difficult enough job without the added burden of individual citizens physically interfering with them in the performance of their duties. According to the F.B.I. Uniform Crime Reporting Program publication entitled *Law Enforcement Officers Killed and Assaulted*, in the year 2014, 96 officers were killed in the line of duty (51 of those were "feloniously killed," and 45 were "accidentally killed"), and 48,315 officers were assaulted while performing their duties. FED. BUREAU OF INVESTIGATION, 2014 LAW ENFORCEMENT OFFICERS KILLED & ASSAULTED (2014), https://www.fbi.gov/about-us/cjis/ucr/leoka/2014/home. It is no surprise to find, therefore, that Texas has made it a crime to interfere with an officer who is performing his duty. TEX. PENAL CODE § 38.15(a)(1) (Interference with Public Duties).

Appellants in these cases have been charged with and convicted of doing exactly that: interfering with officers who were performing their duties. Appellants have complained on appeal, in turn, that it was not they who interfered with the officers, but the officers who were interfering with *them* in the exercise of their constitutional right to speech protected by the First Amendment to the United States Constitution. The court of appeals agreed and reversed their convictions—actually rendering judgments of acquittal. *Faust & Marroquin v. State*, Nos. 02–13–00222–CR & 02–13–00223, 2014 WL 2611186, at *4 (Tex.App.–Ft. Worth June 12, 2014) (mem. op., not designated for publication). We, then, granted the State's petitions for discretionary review to determine whether

the court of appeals's decision was correct.[1]

My colleague, Judge Newell, raises an important question—one that I am frankly drawn to and which I believe may quite possibly be correct—that the court of appeals should never have reached the issue that was raised on appeal in this case. He concludes that Appellants never obtained an adverse ruling—a necessary systemic requirement to an appellant's right to bring up an issue on appeal—on the question addressed by the court of appeals. *See* TEX.R.APP. P. 33.1(a)(2). He concludes that Appellants obtained an adverse ruling only on their request for an acquittal, and based on my reading of the record, I think he might be correct. But I am not certain. And the issue is not one that is so easily decided that I am prepared to resolve it without requesting briefs from the parties. Moreover, that is not the issue upon which this Court granted review. Consequently, I believe the more prudent course for this Court now is to focus on and resolve the issues stated in the grounds for review which we agreed to address.

The majority opinion, as well as the dissent by Presiding Judge Keller, attempt to do just that. They each address the issues on which this Court granted review, albeit in different ways. The Majority and Presiding Judge Keller's opinions debate, as did the court of appeals, whether Appellants' First Amendment rights were violated. Presiding Judge Keller's opinion is concerned about the purpose of the police skirmish line and argues that it was formed to prevent Appellants from "express[ing] their views because their words are hateful." Dissenting Opinion of Presiding Judge Keller at 1. The Majority, also, is concerned with the constitutionality of the skirmish line, appearing to me to conclude that the legality of that police action should determine the outcome in these cases. Majority Opinion at 15–19. The Majority holds, nevertheless, "that the temporary skirmish line was a lawful means to effect the police purpose of preserving the peace...." Majority Opinion at 19.[2]

---

1. We granted the following grounds for review:

 1. Did the Second Court of Appeals err in implicitly holding that citizens can use the First Amendment to the United States Constitution as a shield to disobey lawful orders of law enforcement and forcibly cross a police skirmish line set up at a Gay Pride Parade in Fort Worth, Texas, when those measures by law enforcement are taken to preserve the peace and the safety of the public?

 2. Notwithstanding that police action may infringe on a citizen's First Amendment rights, does a citizen have a right to disobey the orders of a police officer, forcibly breach a skirmish line, and interfere with the officer's duties?

 3. Did the Second Court of Appeals err in failing to conduct a proper "as applied" First Amendment analysis when it concluded that the Fort Worth Police Department's action in constructing a skirmish line at a Gay Pride Parade violated the First Amendment to the United States Constitution?

 4. Did the Second Court of Appeals err in concluding that the skirmish line set up by the police department during the Fort Worth Gay Pride Parade was not a reasonable action as to "time, place, or manner" under the First Amendment to the United States Constitution?

2. The Majority seems to take it as a foregone conclusion that the Interfering with Public Duties statute itself imposes, as an element, a requirement of proof that the public duties being interfered with are being carried out by lawful and constitutional means. Majority Opinion at 11. The statute provides that the officer interfered with must be "performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE § 38.15(a)(1). It is not at all as clear to me, as it seems to be to Judge Newell, that the phrase "imposed or granted by law" modifies both "authority" and "duty" in the statute. Dissenting Opinion of Judge Newell at 3. Discerning whether the words "authority" and "duty" are both modified by the phrase "imposed or granted by law" is no simple grammatical endeavor.

But I see this case differently than both Presiding Judge Keller and the Majority. Correctly framed, the issue in this case, it seems to me, is *not* whether Appellants had a First Amendment right to speak out against the Gay Pride Parade, its organizers and participants, and its message. Of course they did. The issue in this case is also not whether the skirmish line established by the police had the incidental effect of delaying Appellants' access to a location from which, they claim, they wished to exercise their First Amendment rights. The issue, I believe, is whether Appellants were arrested and charged with a crime for exercising their First Amendment rights or whether they were arrested and charged with a crime for interfering with peace officers who were performing their duty.

Appellants were charged with the state criminal offense of interfering with the public duties of a peace officer. TEX. PENAL CODE § 38.15(a)(1) (Interference with Public Duties). That statute provides, in relevant part, that "[a] person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace offi-

cer while the peace officer is performing a duty or exercising authority imposed or granted by law." *Id.* The charging instruments alleged that each defendant did then and there,

WITH CRIMINAL NEGLIGENCE INTERRUPT, DISRUPT, IMPEDE OR INTERFERE WITH ... A PEACE OFFICER, WHO WAS PERFORMING A LAWFUL DUTY, TO-WIT: CONTROLLING THE CROWD AND MAINTAINING THE PEACE AT A GAY PARADE.... [3]

The statute provides a defense to prosecution where "the interruption, disruption, impediment, or interference alleged consisted of speech only." TEX. PENAL CODE § 38.15(a)(1).[4] But this case does not seem to me to turn on the question of the applicability of the "speech only" defense provided for in the statute. No one seems to be arguing that by "cross[ing] a street after being ordered not to cross said street ....", or by "attempting to cross a line or row of police officers by attempting to push through said line of police officers," Appellants engaged in conduct that consisted of "speech only." Instead, Appellants complain in this Court that the con-

---

But even if both are modified by that phrase, it is beyond dispute that the officers in this case had a duty "imposed ... by law" to preserve the peace at the parade. *See e.g.,* TEX.CODE CRIM. PROC. art. 2.13(a) ("It is the duty of every peace officer to preserve the peace within the officer's jurisdiction."). Indeed that is what gave them cause to be present when Appellants violated their skirmish line. But as Judge Newell also notices—and I agree with him about this—there is a proper distinction to be made between a duty imposed by law on an officer and the "means" the officer uses to effect that duty. *Id.* ("To effect this purpose [the duty to preserve the peace], the officer shall use all lawful *means*."). Given that understanding of the language of the statute, I do not believe the statute calls for an acquittal or dismissal, even when it is shown that the reason a person interfered with an officer was because the

officer was first interfering with the person's constitutional rights.

3. The charging instrument in Faust's case alleged further that he committed the offense: "BY ATTEMPTING TO CROSS A STREET AFTER BEING ORDERED NOT TO CROSS SAID STREET...." The charging instrument in Marroquin's case alleged further that he committed the offense: "BY ATTEMPTING TO CROSS A LINE OR ROW OF POLICE OFFICERS BY ATTEMPTING TO PUSH THROUGH SAID LINE OF POLICE OFFICERS...."

4. The United States Supreme Court has held that a similar ordinance, without such a defense, was unconstitutional. *City of Houston, Texas v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

duct of the officers in forming the skirmish line in the first instance violated their right to free speech guaranteed by the First Amendment. They seem to claim that they were privileged to disregard the authority of the police officers who were in their way on that day and in that location because their interest in communicating their message from the place that they wished to communicate it outweighed their duty to refrain from interfering with peace officers who were discharging their duty to keep the peace.

This Court has previously determined, in the context of a prosecution for resisting arrest, that "it is no defense to prosecution that the arrest or search was unlawful." *State v. Mayorga,* 901 S.W.2d 943, 945 (Tex.Crim.App.1995). In that case, this Court adhered to its reasoning in previous cases in which we stated that "the use of self-help to prevent an unlawful arrest presents too great a threat to the safety of individuals and society to be sanctioned," and that "[t]he line between an illegal and legal arrest is too fine to be determined in a street confrontation; it is a question to be decided by the courts." *Id.* (quoting *Barnett v. State,* 615 S.W.2d 220, 223 (Tex. Crim.App.1981)). I am drawn to the wisdom and the logic of a rule prohibiting interference with officers even when citizens believe the officers are wrong. It seems to me that a citizen's dispute with an officer should ordinarily be settled in court, not on the street.

Interestingly, I have found no cases in which the United States Supreme Court has squarely considered whether a statute prohibiting resisting arrest or search is applied constitutionally when the officers' actions violate a citizen's constitutional rights. I am similarly unaware of any cases, by either this Court or the United States Supreme Court, that have squarely addressed that same issue in the context of a statute prohibiting interference with the

public duties of an officer. But in my opinion, to say anything other than that interference with an officer (other than by speech only) is a crime regardless of whether the officer is violating a person's rights, except in very limited circumstances justifying the use of reasonable force for self-defense only, is to invite citizens to seek vindication of their rights on the streets against police officers who may reasonably believe, although they may be mistaken, that they are using lawful means to effect their duties. We should not invite that kind of street justice.

There is no question that a requirement of submission to police authority on the street might mean that, in some cases, a perfect vindication of a deprived right can never be had. Some might argue, for example, that if they lose the one opportunity that was available to them to protest at a particular parade, in a particular location, at a particular time of day, no amount of money damages—and even the firing of the peace officer who violated their rights—can restore that lost opportunity. I am troubled by possible deprivations like that one. But the problem I see with authorizing individuals to seek their own street justice is that it comes at a terrible price—an increased risk of harm, both to the person seeking vindication of their rights and to others present who may attempt to come to the aid of either the citizen or the officer. If such a situation escalates, people can get hurt, or injured, or even killed, and the Constitution cannot defend the right of a dead person to speak. Such a person can only be heard then by the living in memory, or in books or other writings, or through other recorded media.

Even the United States Supreme Court has recognized that police are authorized to use physical coercion in order to effect their duties. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d

443 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). That is certainly true in Texas. Our law authorizes officers to effect their duties using "all lawful means." TEX.CODE CRIM. PROC. art. 2.13(a). Our law explicitly authorizes the use of force by peace officers when they reasonably believe it is immediately necessary to make or assist in making an arrest or search or to prevent an escape after arrest, as long as they reasonably believe the arrest or search is lawful. TEX. PENAL CODE § 9.51(a). It also authorizes, in limited circumstances, the use by an officer of deadly force. TEX. PENAL CODE § 9.51(c).

I certainly do not want officers to violate the constitutional or statutory rights of our citizens. Nevertheless, I am convinced that rights that are lost in community-based citizen/police encounters—between citizens who believe their rights are being violated and officers who reasonably believe the means they have chosen to effect their duties are lawful and constitutional—are outweighed by the danger of encouraging lawless disregard for an officer's authority on the street. While rights lost may never be vindicated fully in the sense that a right lost in a moment in time may never be restored, those rights can be somewhat imperfectly vindicated by subsequent court actions. It is better to encourage citizens to settle their disputes with police in a courtroom than to encourage them to settle them on the street, with the potential for violence—especially when the violence could be deadly.

Under my reading of the Interference with Public Duties of an Officer statute, a person is not authorized to interfere with an officer even if the person believes their rights are being violated by the officer—and this is so regardless of whether the person's assessment of the propriety of the officer's chosen means of effecting his duty might later be vindicated by a court. The statute simply prohibits interfering with an officer while the officer is performing his duties. The statute provides a defense if the interference consists of "speech only." TEX. PENAL CODE § 38.15(d). Interference beyond "speech only" is proscribed. Period. A dispute about the means an officer uses to carry out his duties "is a question to be settled by the courts." *Barnett*, 615 S.W.2d at 223.[5]

The Majority and Presiding Judge Keller's opinions suggest that citizens have the right to interfere with peace officers if the citizens believe that their rights are being violated by the means chosen by the officers to effect their duties. Their opinions suggest that if the citizen's belief is one that would later be vindicated by the courts, the citizen is justified in interfering with the officer's performance of his duties. It is not hard to imagine that such interference might get someone harmed or even killed. That might hurt the citizens whose rights were violated by the police, and it might harm the officer too, who might only later learn that he has harmed a citizen physically when it was he, the officer, who provoked the citizen's interference due to a mistaken but reasonable belief that his conduct was justified.

I respectfully concur only in the judgment of the court.

---

5. That is not to say that a person has no right to resist an officer no matter what the circumstances. Certainly there is a limited right to self-defense against an officer "if before the actor offers any resistance, the peace officer [] uses or attempts to use more force than necessary to make the arrest or search; and

[] when and to the degree the actor believes the force is immediately necessary to protect himself against the peace officer's ... use or attempted use of greater force than necessary." TEX. PENAL CODE § 9.31(c). Thankfully, that issue is not raised in this case.

Keller, P.J., filed a dissenting opinion.

Now wait a minute. After a gay-pride parade, police stop members of the Kingdom Baptist Church—and no one else—from walking down a public street. The police do this because they think that the views expressed by the group during the parade are "hateful" and because at the parade a year earlier, a different member of the church assaulted a gay man. This cannot be right. The First Amendment protects freedom of speech, even speech that is "hateful."

The primary issue before us is what standard should be used to evaluate whether the police-imposed restriction on the church members' speech is valid. The Court applies the traditional intermediate scrutiny test for content-neutral "time, place, or manner" restrictions that are imposed by law. This is the wrong standard for two reasons. First, there is a difference between a *law* imposing a "time, place, or manner" restriction and *police officers* imposing such a restriction on their own. Second, the restriction in this case was not content-neutral; it was viewpoint-based. Because the First Amendment requires the restriction here to be judged by a more rigorous standard than that employed by the Court, and the re-

striction cannot be justified under a more rigorous standard, I must dissent.

I write also to express my disagreement with the concurring opinions' view that appellants can still be convicted even if the police officers acted in violation of the First Amendment.

## I. THE EVIDENCE

The officers in this case were concerned about the possibility of violence between members of the 2012 gay-pride parade and members of the Kingdom Baptist Church. Although the sergeants' testimony contains some references to prior "altercations" between members of these two groups, the only incident that was specifically described as occurring at the 2011 parade was an assault on a gay man by a person named Chad Sutherland, against whom charges were never filed.[1] Sergeant DeHoyos testified that both Faust and Marroquin were at the 2011 gay-pride parade, that neither of them was arrested, and that neither of them was involved in a violent incident in that parade.[2]

Before the 2012 parade, police officers formed into several two-person teams that monitored the parade and the onlookers, and the parade traveled down Main Street past First, Second, and Third Streets without a violent incident.[3] It was only after

---

**1.** *See Faust v. State,* 2014 Tex.App. LEXIS 6409, *8 (Tex.App.-Fort Worth June 12, 2014) (not designated for publication). Sergeant DeHoyos also testified that at the 2011 parade she heard protesters saying, "I hope you die in a fiery crash," and "go ahead and kill yourself, you faggot," and that the 2011 parade involved "an entire day of that type of speech being uttered by these individuals." The officer did not testify that either of the appellants had engaged in such comments.

**2.** Sergeant Genualdo testified that Faust, Marroquin, and other members of the church would come out on Friday nights and engage in "what they claimed" was street preaching but other people claimed was a "verbal assault." Sergeant Genualdo also referred to it

as "verbally assaulting" people. No attempt was made to describe these incidents in detail.

**3.** During this time, there were twenty to thirty church members, who were "preaching or expressing their views." Sergeant DeHoyos did not remember what was said, but she testified that they had signs that said something like "believe in Jesus or burn in hell for being gay" or rebuked people for being gay or having gay family and saying that they were going to go to hell or burn in hell if they did not repent of their sins. Video recordings of the offenses and the events surrounding the offenses were introduced into evidence. Signs that are visible in these video record-

the marchers had passed Third Street and the parade had ended that the police formed a skirmish line, at the intersection of Third and Main, between members of the Kingdom Baptist Church and the people who continued walking down Main Street toward the festival. The skirmish line remained in place until the people continuing down Main Street reached the 900 block, where the festival was taking place. Sergeants Genauldo and DeHoyos both testified that in 2011, after the incident with Chad Sutherland, a skirmish line was set up at the 900 block. Both officers further testified that the Kingdom Baptist Church members had honored that skirmish line. But at the 2012 parade, the officers decided to be "proactive" and set up a skirmish line six blocks away from the line imposed in 2011 and the ultimate destination of the paraders. Sergeant DeHoyos acknowledged that people detained at Third Street would not be able to communicate with people in the 800 or 900 block of Main Street. The officers maintained the fixed line for every member of the church regardless of whether a particular member had ever previously been involved in any violent incidents. The stated justification for doing this was the officers' perception that there was a possibility that violence could occur.[4]

## II. LEVEL OF SCRUTINY

### A. Time, Place, or Manner Restrictions

#### 1. Restrictions Imposed by Laws of General Applicability vs. Restrictions Imposed by Other Sources

Even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided that the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.[5] In such cases, intermediate scrutiny is the proper test. This is not necessarily the test, however, when the restriction is imposed by something other than a law (or ordinance or regulation) of general applicability. The restriction in the present case was imposed not by a law of general applicability, but as the result of a case-specific determination by the police.

In *Madsen v. Women's Health Center*, the Supreme Court addressed the proper standard for evaluating a content-neutral "time, place, or manner" restriction imposed by an injunction.[6] Although the

---

ings say, among other things, "Let the Wicked Forsake His Way," "Turn to Jesus or Burn in Hell," "It's Time to Repent," "God is Angry with the Wicked Every Day," and "What the Bible Says About Homosexuality." The signs generally have specific references to chapters and verses of the Bible and they call for viewers to repent and turn to God, but at least one makes no reference to religion at all.

4. Sergeant Genualdo testified, "There is always the possibility of a physical altercation between two groups that disagreed. Since we had a history of it in the past, and I'm assuming that Mr. Faust doesn't normally engage in physical altercations, it was my duty to make sure that neither side got into a physical altercation." Then the following colloquy occurred:

Q. Did you see any evidence of him engaging in any physical altercations?
A. No.
Q. But it was your suspicion that if he went by you, he might do that; is that correct?
A. There certainly was a possibility that that would occur, yes.
Q. Is there also a possibility that he wouldn't engage in a physical altercation?
A. Yes.

5. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

6. 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994).

case before us does not involve an injunction, police-imposed restrictions are similar to injunctions in that neither is the result of a law of general applicability. According to *Madsen*, that makes a difference.

In *Madsen*, the Court explained that the traditional intermediate-scrutiny test articulated in cases such as *Ward v. Rock Against Racism*[7] would apply "[i]f this were a content-neutral, generally applicable statute [or ordinance], instead of an injunctive order."[8] But the Supreme Court found obvious differences between these two sources of "time, place, or manner" restrictions.[9] While ordinances represent a legislative choice to promote certain societal interests, injunctions are remedies imposed for violations of a legislative or judicial decree.[10] Injunctions "carry greater risks of censorship and discriminatory application" than do general statutes or ordinances.[11] "There is no more effective practical guaranty against arbitrary and unreasonable government," the Supreme Court explained, "than to require that the principles of law which officials would impose upon a minority must be imposed generally."[12]

The Supreme Court concluded that the "standard time, place, and manner analysis is not sufficiently rigorous" and that, when an injunction is challenged on First Amendment grounds, "a somewhat more stringent application of general First Amendment principles" is required.[13] The

Court concluded that the correct standard for evaluating a challenge to a content-neutral provision of an injunction is whether the provision "burden[s] no more speech than necessary to serve a significant government interest."[14]

Justice Scalia, joined by Justices Kennedy and Thomas, would have required strict scrutiny.[15] In Justice Scalia's view, although a speech-restricting injunction might not attack content *as content*, "it lends itself just as readily to the targeted suppression of particular ideas."[16] He said, "Such targeting of one or the other side of an ideological dispute cannot readily be achieved in speech-restricting general legislation except by making content the basis of the restriction; it is achieved in speech-restricting injunctions almost invariably."[17]

In the case before us, police created a skirmish line to prevent members of the Kingdom Baptist Church from walking down Main Street after the 2012 gay-pride parade until the people from the parade traveled six blocks south to the festival. This time and place restriction imposed by the officers was not imposed pursuant to any statute or ordinance. Even if we assume that this police-imposed restriction was content-neutral, it more closely resembles the imposition of a time, place, or manner restriction by an injunction than by a law.

**7.** 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

**8.** *Madsen*, 512 U.S. at 765, 114 S.Ct. 2516 (bracketed material added to reflect subsequent references to ordinances in the Court's discussion).

**9.** *Id.*

**10.** *Id.*

**11.** *Id.*

**12.** *Id.* (quoting *Railway Express Agency v. New York*, 336 U.S. 106, 112–13, 69 S.Ct. 463, 93 L.Ed. 533 (1949)).

**13.** *Id.*

**14.** *Id.*

**15.** *Id.* at 790–95, 114 S.Ct. 2516 (Scalia, J., concurring and dissenting).

**16.** *Id.* at 793, 114 S.Ct. 2516.

**17.** *Id.*

Moreover, the idea that the absence of such a law mandates a stricter standard of review is supported by Supreme Court caselaw involving ordinances that place broad discretion in the hands of a public official to grant or deny a permit to engage in First Amendment expression at certain times and places.[18] The Court has held that such an ordinance must "contain adequate standards to guide the official's decision and render it subject to effective judicial review."[19] Where legislative guidance is lacking, it follows that the standard of review must be more rigorous.[20] Consequently, the traditional intermediate-scrutiny test is inadequate here. At the very least, the test should be whether the challenged provision "burden[s] no more speech than necessary to serve a significant government interest."

### 2. *Duration of Restriction*

Judge Johnson's concurring opinion points out that the officer-imposed restriction in this case was temporary. It is true that the restriction in *Madsen* was a permanent injunction.[21] Nevertheless, when political or social expression is involved, the timing of that expression may be an important element.[22] In the context of protests at expressive events for which a permit has been obtained, courts have suggested that a protester should be allowed free access as long as he does not interfere with the expressive activities of the event participants.[23] Only when the protester

**18.** *See Thomas v. Chicago Park District,* 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002).

**19.** *Id.*

**20.** The Court contends that there is a "distinction between analyzing First Amendment challenges to an injunction ... and analyzing a First Amendment challenge to a police skirmish line order, which is a government imposed restriction pursuant to statutory authority." I assume the statutory authority to which the Court refers is Article 2.13 of the Texas Code of Criminal Procedure. But that provision, which simply gives peace officers the duty "to preserve the peace within the officer's jurisdiction," provides absolutely no standards for guiding the decision-making of the police with respect to imposing restrictions on freedom of expression.

**21.** *See Madsen,* 512 U.S. at 758, 114 S.Ct. 2516.

**22.** *Carroll v. President & Commissioners of Princess Anne,* 393 U.S. 175, 182, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) ("The present case involves a rally and 'political' speech in which the element of timeliness may be important. As MR. JUSTICE HARLAN, dissenting in *A Quantity of Books v. Kansas,* pointed out, speaking of 'political and social expression': 'It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances.'"); *Elrod v. Burns,* 427 U.S. 347, 373–74 & n. 29, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.... The timeliness of political speech is particularly important."); *Collins v. Jordan,* 110 F.3d 1363, 1372–73 (9th Cir.1996) ("Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events.... Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion.").

**23.** *See Startzell v. City of Philadelphia,* 533 F.3d 183, 194–95 (3d Cir.2008) (referring to "the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora" and holding that the event hosts could not exclude "dissenting speakers on the Philadelphia streets and sidewalks where [the event] took place" but also holding that "[t]he right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit"); *Parks v. City of Columbus,* 395 F.3d 643, 652–54 (6th

begins to disrupt the activities of the event does "the existence of a permit tilt[ ] the balance in favor of the permit-holders" to allow a restriction.[24]

### 3. *The Restriction Imposed by the Police Does Not Satisfy the Standard Applicable to Injunctions*

Because I believe that the restriction in this case was viewpoint-based instead of content-neutral, I will not spend too much time explaining why I believe that it fails the *Madsen* test, which applies to content-neutral restrictions. Suffice it to say that a moving skirmish line, or the two-person teams used successfully during the 2012 parade, or a repeat of the effective 2011 skirmish line should have been adequate to

address police concerns while lessening the burden on the protestors' speech. The fixed skirmish line therefore burdened more speech than necessary to achieve the interest of preventing violence.[25]

### B. Strict Scrutiny

### 1. *The Restriction in this Case was Content–Based or Viewpoint–Based, Requiring the Application of the "Strict Scrutiny" Standard.*

The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." [26] Public streets and sidewalks are traditional public fora that "time out of mind, have

Cir.2005) (improper to exclude a person from arts festival on the basis of his wearing a sign that communicated a religious message when he was acting peacefully during the event). *See also Gathright v. City of Portland,* 439 F.3d 573, 576–79 (9th Cir.2006) (Policy allowing permit holder at an expressive event to exclude unwanted individuals on the basis of their views violated the First Amendment.).

**24.** *See Startzell,* 533 F.3d at 199 (Police could move protesters away from event activities when protesters were using bullhorns and microphones in an attempt to drown out the platform speakers.).

**25.** In a footnote, the Court suggests that the skirmish line could be justified either because appellants' used "fighting words" or because there was a risk that they would use "fighting words" in close proximity to the paraders and thus risk the eruption of violence. The Court points to Faust's statement to Sergeant Genualdo that he was working for a lesbian and he was a "fag" who needed to put on earrings and put a bow in his hair. But even speech that arouses anger or hatred is protected by the First Amendment. *Virginia v. Black,* 538 U.S. 343, 366, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) ("It may be true that a cross burning, even at a political rally, arouses a sense of anger or hatred among the vast majority of citizens who see a burning cross. But this sense of anger or hatred is not sufficient to ban all cross burnings."). To qualify

as fighting words, the utterance must be "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). I am skeptical that Faust's statements would qualify as such, even if directed at the paraders, and there is no evidence that violence or unrest was brewing in the crowd. As for the police, the officers remained calm and acted professionally throughout the entire episode.

Further, even if Faust's post-restriction statement were relevant to whether Faust should have been allowed to cross the skirmish line, it was not relevant to the validity of the skirmish line with respect to *Marroquin.* The only specific statements recited in the record as being made by either Faust or Marroquin at the parade before the imposition of the skirmish line that were inflammatory with respect to members of the parade were signs that suggested that homosexuals would go to hell or burn in hell. But religions and religious groups often make claims about hell and what may cause someone to end up there. These signs communicated a religious viewpoint, and do not themselves convey fighting words.

**26.** *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[27] A time, place, or manner restriction that is content-based must satisfy strict scrutiny if the restriction occurs in a public forum, as it did here.[28] The restriction in this case was content-based because whether protesting church members were allowed to walk down Main Street depended entirely upon what they said and what was written on their signs. Everyone except members of the church and others who might have had similar signs was allowed to pass.

Moreover, the officers' own testimony shows that the restriction was not just content-based, but viewpoint-based. When Sergeant Guenaldo was asked whether "it was because [Faust] was a member of this church group" that the police would not let him go down the street, he indicated that that was true of not just Faust, but the whole group. When asked why other members of the public were permitted to cross through the skirmish line he said, "Because they were not members of that church, they were not members of the group that were historically causing problems."

The sergeant was concerned that Faust would use "the same terminology and words" he used on the sergeant. When asked whether he thought a member of the public who uses those words is subject to arrest, the sergeant answered, "Well, I know two things. Number one, that the use of profanity is against Texas state law under disorderly conduct. Number two, I know that those kind of words are not protected as free speech under the U.S. Constitution." Sergeant Guenaldo said the unprotected words to which he was referring were "the part about lesbians and putting bows in my hair and such."

Sergeant DeHoyos testified that, in reference to the parade and protest the prior year, she asked herself whether it was hate speech or free speech "because they were berating people." She said that, in this case, members of the church were "preaching or expressing their views." She said the words were "abusive" and "very hateful," but not profane.

Other people were allowed to pass through the skirmish line "[b]ecause they were not part of the Kingdom Baptist Church." But anyone else who was carrying signs that the officer considered to be "provocative" would also have been detained. Sergeant DeHoyos testified that "the message on the sign" was part of the reason that Faust and Marroquin were stopped.

Sergeant DeHoyos's police report said that the Kingdom Baptist Church has "extreme anti-homosexual views," by which she meant "it wasn't just repent your sins," it was "the language they used to get people to want to repent their sins," which she said was, to her, "an extreme view." When asked whether it was the officer's understanding that the church members wanted to go to where the other group was meeting in order to express their religious views, the officer answered, "Yes and no." She said:

> The no is that yes, they would express their religious views, but that it wouldn't just be religious views, that it would— the language that they used was very hateful, hurtful, berating, degrading, humiliating. To me, that—that is not necessarily a religious view.

Although the officer denied that she was making a distinction between what she thought would be a proper religious view and what the church members might think

---

27. *Id.*

28. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009).

would be a proper religious view, she clearly was doing just that. And she acknowledged that it would be the members' viewpoint, religious or otherwise, that they wanted to express. For all of these reasons, I conclude that the restriction was viewpoint-based.

### 2. *The Possibility of Violence Did Not Justify the Restriction*

The mere possibility of violence is not sufficient to impose even modest restrictions on freedom of speech: The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden."[29] Where evidence shows no more than that the opinions being peaceably expressed are "sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection ... 'the compelling answer ... is that constitutional rights may not be denied simply because of hostility to their assertion or exercise.'"[30]

*Kunz v. New York* is instructive.[31] There, the Supreme Court considered the constitutionality of a city ordinance that required a permit to conduct public religious services.[32] In public, Kunz preached such things as, "the Catholic Church makes merchandise out of souls," Catholicism is "a religion of the devil," and the Pope is "the anti-Christ."[33] He de-

nounced the Jews as "Christ-killers," and he said of them, "All the garbage that didn't believe in Christ should have been burnt in the incinerators. It's a shame they all weren't."[34] The Court held that the ordinance was clearly invalid as a prior restraint on the exercise of First Amendment Rights because it gave an administrative official discretionary power to control in advance the right of citizens to speak on the streets about religious matters.[35] Moreover, the Court refused to take into account the fact that meetings had, in the past, caused some disorder. It said, "There are appropriate public remedies to protect the peace and order of the community if appellant's' speeches should result in disorder or violence..... New York cannot vest restraining control over the right to speak on religious subjects in an administrative official where there are no appropriate standards to guide his action."[36]

### 3. *Other Factors Suggest that a Police–Imposed Restriction, Even if Content–Neutral, Is Subject to Strict Scrutiny*

One reason the *Madsen* court declined to impose the strict-scrutiny standard in the injunction context is that, though injunctions pose special dangers to free expression, the injunction is a somewhat limited tool, applying to individuals or groups who have engaged in illegal activity.[37] We

**29.** *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); *see also McCutcheon v. Federal Election Commission*, —— U.S. ——, 134 S.Ct. 1434, 1452, 188 L.Ed.2d 468 (2014) (op. of Roberts, C.J., joined by Scalia, Kennedy, and Alito, JJ.).

**30.** *Cox v. Louisiana*, 379 U.S. 536, 551, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

**31.** *Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951).

**32.** *Id.* at 294–95, 71 S.Ct. 312.

**33.** *Id.* at 296, 71 S.Ct. 312 (Justice Jackson dissenting).

**34.** *Id.*

**35.** *Id.* at 294–95, 71 S.Ct. 312 (Court's op.).

**36.** *Id.*

**37.** *Madsen*, 512 U.S. at 766, 114 S.Ct. 2516 ("JUSTICE STEVENS believes that 'injunctive relief should be judged by a more lenient standard than legislation,' because injunctions are imposed on individuals or groups who have engaged in illegal activity. *Post*, at 778. JUSTICE SCALIA, by contrast, believes

might add that an injunction is a judicial process with procedural protections, that there are requirements that must be satisfied to obtain an injunction,[38] that adverse parties have the opportunity to contest or suggest modifications to an injunction,[39] that injunctions give advance notice of what is prohibited, and that injunctions describe in detail in written form what is prohibited. Advance notice of a detailed description of a time, place, or manner restriction might at least give those subject to an injunction the ability to plan ahead to maximize the effectiveness of their expressive activities even while complying with the restriction.

But none of these protections associated with an injunction were associated with the police-imposed restriction in this case. There was no advance notice that there would be a skirmish line. Appellants and the other members of the Kingdom Baptist Church were not afforded any opportunity to object to the skirmish line in front of a neutral decision-maker or to suggest modifications. Nothing in the record suggests that appellants or other members of the church were told how long the skirmish line would be in effect, and in fact, the officer who dealt with Faust testified that he gave Faust no such indication.

Essentially, the officers imposed injunctive-type relief without obtaining an injunction.[40] It is unlikely that an injunction could have been obtained authorizing the fixed skirmish line that was imposed here because appellants had no history of being involved in physical altercations. But an attempt could have been made to obtain an injunction, and perhaps the police might have been able to produce more evidence at a hearing. It appears that the gay-pride parade was an annual event, so there would have been time to attempt to obtain an injunction imposing the skirmish line. It stands to reason that the imposition of a time, place, or manner restriction without an injunction when one could have been sought (or was sought, but unsuccessfully) should be subject to a higher level of scrutiny than such a restriction imposed by an injunction.

### 4. The Restriction Does Not Satisfy Strict Scrutiny

To satisfy strict scrutiny, a restriction must be narrowly drawn to serve a compelling government interest.[41] In this context, "narrowly drawn" means the least restrictive means of achieving the government interest.[42] No one has suggested that the fixed skirmish line satisfies this test, and I agree that it does not.

that content-neutral injunctions are 'at least as deserving of strict scrutiny as a statutory, content-based restriction.' *Post*, at 792. JUSTICE SCALIA bases his belief on the danger that injunctions, even though they might not 'attack content as *content*,' may be used to suppress particular ideas; that individual judges should not be trusted to impose injunctions in this context; and that an injunction is procedurally more difficult to challenge than a statute. *Post*, at 793–794. We believe that consideration of *all* of the differences and similarities between statutes and injunctions supports, as a matter of policy, the standard we apply here.") (emphasis in original).

38. *See Kansas v. Nebraska*, 153 S.Ct. 1042, 1059 (2015) (to obtain an injunction, moving

party must show "a cognizable danger of recurrent violation").

39. *See Carroll*, 393 U.S. at 181–82, 89 S.Ct. 347 (discussing importance in injunction context of making reasonable efforts to notify adverse parties before restraining expression).

40. Sergeants Genualdo and DeHoyos both testified that there was no court order imposing (or even authorizing) the skirmish line.

41. *Ex parte Thompson*, 442 S.W.3d 325, 344 (Tex.Crim.App.2014).

42. *Id.*

## II. PUNISHMENT FOR DISOBEYING POLICE ORDERS

The concurrences contend that, even if the skirmish line violated appellants' First Amendment rights, they could be punished for interfering with the reasonable exercise of police authority without violating the First Amendment. The concurrences rely, by analogy, on resisting-arrest cases. But the resisting-arrest statute explicitly says, "It is no defense to prosecution under this section that the arrest or search was unlawful." [43] More to the point, an arrest does not, *by itself*, impose a restriction on First Amendment expression; rather, arrest is an enforcement mechanism for the violation of a law or order, and it is the law or order that might impose a restriction on expression. By contrast, as the present case illustrates, the interference-with-public-duties statute may encompass police orders that in themselves restrict expression.

If an unconstitutional restriction on freedom of speech were imposed by statute, a criminal defendant who disobeyed the statute would unquestionably be able to challenge the criminal prosecution against him by raising the statute's unconstitutionality. [44] By contrast, a defendant who disobeys a court order may not defend against a contempt prosecution on the basis that

the order is unconstitutional if legal avenues to challenge the order were available. [45] But the police obtained no court order in the present case, and there was no time to prospectively challenge the police skirmish line in court. [46]

When it comes to protests and other expressive demonstrations within the protection of the First Amendment, a police officer who issues an illegal order essentially acts like a lawmaker, and the State does not get a free pass to convict someone of a crime for violating such an order. In *Cox v. Louisiana*, Cox was convicted of violating a statute that made it a crime to congregate with others in a public space and refuse to disperse when ordered to do so by a law enforcement officer. [47] Cox led a group of students to protest segregation and discrimination and the arrest of 23 fellow students. [48] The protestors were assembled across the street from the courthouse. [49] After Cox urged them to sit in at lunch counters, the sheriff, deeming this statement to be inflammatory, took a power microphone and told the assembly to break up. [50] Making a gesture of defiance, Cox told the others "don't move," and the assembly did not break up until policemen exploded a tear gas shell at the crowd. [51] The Supreme Court reversed Cox's conviction, finding that, "allowing unfettered dis-

---

43. TEX. PENAL CODE § 38.03(b).

44. *See Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (overturning conviction based on statute barring the exhibition of a United States flag with attached figures, symbols, or other extraneous material because, as applied, statute unconstitutionally infringed on expression protected by the First Amendment).

45. *See Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

46. *See id.* at 318–19, 87 S.Ct. 1824 (observing that "[t]here was an interim of two days between the issuance of the injunction and the

Good Friday march" and that "Alabama procedure would have provided for an expedited process of appellate review" and concluding, "It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims.")

47. 379 U.S. at 544, 85 S.Ct. 453.

48. *Id.* at 545–46, 85 S.Ct. 453.

49. *Id.* at 541, 85 S.Ct. 453.

50. *Id.* at 543, 85 S.Ct. 453.

51. *Id.* at 543–44, 85 S.Ct. 453.

cretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgement of appellant's freedom of speech and assembly secured to him by the First Amendment." [52] The Court did not require Cox to submit to the order to disperse and relegate him to seeking a civil remedy after doing so. In a companion case, the Court stated that an order to disperse that violated the First Amendment could not be used to sustain a conviction: "Assuming the place of the meeting was appropriate ... nothing in [the relevant statutes] authorizes the police to draw the narrow time line, unrelated to any policy of these statutes, that would be approved if we were to sustain appellant's conviction on this ground." [53]

In *Flower v. United States*, the Supreme Court reversed the conviction of a person who distributed leaflets on a public street on a military base in violation of an order from the base commandant.[54] The Court said, because the military had abandoned any regulation of the street in question, "the base commandant can no more order petitioner off this public street because he was distributing leaflets than could a city police order any leafleteer off any public street." [55]

In a concurring opinion in *Gregory v. Chicago*, Justice Black explained the danger of imposing criminal liability on someone who engages in protected expression merely because, in doing so, he violated the order of a police officer:

> Their guilt of "disorderly conduct" therefore turns out to be their refusal to

obey instanter an individual policeman's command to leave the area of the Mayor's home. Since neither the city council nor the state legislature had enacted a narrowly drawn statute forbidding disruptive picketing or demonstrating in a residential neighborhood, the conduct involved here could become "disorderly" only if the policeman's command was a law which the petitioners were bound to obey at their peril. But under our democratic system of government, lawmaking is not entrusted to the moment-to-moment judgment of the policeman on his beat. Laws, that is valid laws, are to be made by representatives chosen to make laws for the future, not by police officers whose duty is to enforce laws already enacted and to make arrests only for conduct already made criminal. One of our proudest boasts is that no man can be convicted of crime for conduct, innocent when engaged in, that is later made criminal. To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws. There are ample ways to protect the domestic tranquility without subjecting First Amendment freedoms to such a clumsy and unwieldy weapon.[56]

Having concluded that the fixed skirmish line imposed by the police in this case violated the First Amendment, I would affirm the court of appeals's decision to reverse appellants' convictions. Because the Court does not, I respectfully dissent.

**52.** *Id.* at 558, 85 S.Ct. 453.

**53.** *Cox v. Louisiana*, 379 U.S. 559, 573, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (referring back to breach of peace and obstruction of public passages statutes "with their broad sweep and application that we have condemned in" *Cox*, 379 U.S. at 553–58, 85 S.Ct. 453).

**54.** 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972).

**55.** *Id.* at 198, 92 S.Ct. 1842.

**56.** 394 U.S. 111, 120–21, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (Black, J., concurring).

Newell, J., filed a dissenting opinion.

I dissent because I have concerns regarding the way this case was presented to both the trial court and the court of appeals. On appeal, the appellants argue that § 38.15 of the Penal Code (Interference with Public Duties) was unconstitutionally applied to them. But in the trial court, the appellants, even after arguing an as-applied challenge, requested only that the trial court find them not guilty. I dissent because I would remand the case to the court of appeals so that court could first analyze the appellants' sufficiency challenge and then address whether the appellants' requested order preserved their as-applied challenge to the constitutionality of the statute.

Preservation of error is a systemic requirement on appeal. *Haley v. State*, 173 S.W.3d 510, 515 (Tex.Crim.App.2005). If an issue has not been preserved for appeal, neither the court of appeals nor this Court should address the merits of that issue. *Id.* ("Because we have held that preservation of error is a systemic requirement that must be reviewed by the courts of appeals regardless of whether the issue is raised by the parties, our inquiry into whether [the appellant] properly preserved this alleged error is appropriate."). Ordinarily, a court of appeals should review preservation of error on its own motion, but if it does not do so expressly, this Court can and should do so when confronted with a preservation question. *Jones v. State*, 942 S.W.2d 1, 2 n. 1 (Tex.Crim.App. 1997). A challenge to the constitutionality of a statute must be raised in the trial court in order to be preserved for appellate review. *Curry v. State*, 910 S.W.2d 490, 496 (Tex.Crim.App.1995); *see also Karenev v. State*, 281 S.W.3d 428, 434 (Tex.Crim.App.2009) (holding that a facial challenge to the constitutionality of statute cannot be raised for the first time on appeal). To properly preserve a claim for

relief, all a party has to do is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in a proper position to do something about it. *Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App.1992). And the party must obtain an adverse ruling on the claim. Tex.R.App. P. 33.1.

The State prosecuted each of the appellants under identical charging instruments. The State had to prove that the appellants had, with criminal negligence, interrupted, disrupted, impeded, or interfered with "P. Genualdo, a peace officer, who was performing a lawful duty, to wit: controlling the crowd and maintaining the peace at a gay pride parade, by attempting to cross a street after being ordered not to cross said street, and said defendant knew that P. Genualdo, was a peace officer." The plain language of Section 38.15 requires the State to prove that the officer exercised a lawful duty or authority, but the phrase "imposed or granted by law" modifies the officer's duty or authority rather than the methods he uses to exercise that duty or authority. Tex. Penal Code Ann. § 38.15(a)(1) (West 2013). Moreover, it is a defense to prosecution under subsection (a)(1) that the interruption, disruption, impediment, or interference alleged "consisted of speech only." Tex. Penal Code Ann. § 38.15(d) (West 2013). This is why one court of appeals has determined that the statute penalizes conduct rather than speech. *Duncantell v. State*, 230 S.W.3d 835, 843–44 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd.) (addressing overbreadth and vagueness challenges to section 38.15 after first determining that the statute only limits conduct rather than speech).

On the day of trial, the appellants filed identical "Motion(s) for Judgment" with identical accompanying memorandums of

law. The central argument in these motions was that the appellants' arrests and prosecutions, based upon an application of Section 38.15 of the Texas Penal Code, violated the First and Fourteenth Amendments. But they also specifically requested that the trial court sign a judgment finding each of the appellants not guilty. The proposed order recited that the appellants had moved for a judgment based upon an unconstitutional application of the statute, but the judgment itself would have resulted only in a finding of "not guilty."

After the close of evidence, the appellants' counsel acknowledged that he had to bring their motions after the close of evidence because criminal courts do not have the same pre-trial motions practice as civil courts.[1] Again, the major thrust of the appellants' argument was that the statute was unconstitutional as applied to them because their speech was protected by the First Amendment. But they also argued that the police were not authorized to take action to prevent a breach of the peace, a refutation of an element of the offense. And all of the appellants' arguments rested upon the premise that their conduct

amounted to "speech only," which would have been a defense to prosecution under a proper application of the statute. The State responded that the cases the appellants' counsel cited referred to legitimate First Amendment conduct, but the State also argued that the officers were performing their lawful duties.

These arguments suggest two possible theories of relief. On the one hand, the appellants seemed to argue that the police had the lawful duty and authority to prevent a breach of the peace, but their discretionary exercise of that authority violated the First Amendment. The bulk of the appellants' arguments to the trial court centered on this theory. On the other hand, the appellants were also arguing that their conduct amounted to speech and that the police lacked the authority to arrest them in order to prevent a breach of the peace.[2] The former argument would be a constitutional challenge to the application of the statute in this case because it recognizes that the evidence supports all the elements of the offense but maintains that the statute operates unconstitutionally in this case. The latter would either be a

---

1. *See Ex parte Hammonds*, 155 Tex.Crim. 82, 230 S.W.2d 820, 821 (Tex.Crim.App.1950) ("In Texas, procedure such as demurrer to the evidence, declaratory judgment or pretrial judgment, in criminal cases, is not recognized.")

2. The majority points to article 2.13 of the Code of Criminal Procedure to suggest that the appellants' challenges to whether the officers employed "lawful means" in carrying out their duty to preserve the peace is an as-applied challenge to the statute. (Majority op. at p. 17); *see also* TEX.CODE CRIM. PROC. ANN. art 2.13 (West 2013). This exemplifies why the preservation issue in this case has fostered such confusion that has prevented a proper analysis of the claims at issue. The argument that the authority or duty of the officers in this case were limited to "lawful means" by article 2.13 is actually a sufficiency challenge. As we have explained, some legal sufficiency

challenges turn on the meaning of the statute under which the defendant is being prosecuted, and we resort to statutory construction to determine the scope of the offense itself. *Liverman v. State*, 470 S.W.3d 831, 835 (Tex. Crim.App.2015). The claim that the officer's duty or authority may or may not be limited to "lawful means" is that type of legal sufficiency challenge. Article 2.13 does not create an offense; it establishes one possible duty of (or source of authority for) any peace officer. The State alleged this duty (as opposed to another possible statutory duty or authority) as the duty or authority the appellants interfered with in violation of § 38.15. The duty or authority to preserve the peace was an element of the offense, and arguing that the officers lacked authority because they did not use "lawful means" is a legal sufficiency challenge that turns on the meaning of the statute under which the defendant is being prosecuted. *Id.*

challenge to the State's ability to establish an element of the offense, namely whether the officers had a duty or authority imposed or granted by law, or it would be a defense to prosecution under the statute because the conduct at issue amounted to "speech only." Tex. Penal Code Ann. § 38.15 (West 2013).

Perhaps tellingly, the court responded to the appellants' motion and arguments by seeking clarification.

THE COURT: I don't know what you want me to do with this motion. What—what remedy are you seeking based upon this motion.

MR. SHARPE: The motion that I'm seeking is for you to sign a judgment finding that the arrest and prosecution under this law, as applied to these facts, they are not guilty.

The trial court took a brief recess to review the motions, but came back out and characterized the arguments on the motion as "final argument." He allowed additional final argument, and then afterwards denied the motions and found each of the appellants guilty.

Preservation of error does not require magic words so long as the substance of the complaint is conveyed to the trial court in the context of the proceedings. *See e.g. Bennett v. State,* 235 S.W.3d 241, 243 (Tex. Crim.App.2007) (holding that request for self-defense instruction did not necessarily include a request for an instruction on defense of a third-person). But it does require that the objecting party clearly explain his theory of relief. *Resendez v. State,* 306 S.W.3d 308, 312 (Tex.Crim.App. 2009) ("The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint."). And requesting a "finding of not guilty" is more than "magic words;" it carries significant constitutional implications.

As this Court has made clear, the entry of an acquittal bars appellate review of the trial court's ruling.

One of the most fundamental rules of double-jeopardy jurisprudence is that when a trial ends in an acquittal, the defendant may not be tried again for the same offense. Whether the acquittal is based on a jury verdict of not guilty or on a ruling by the trial court that the evidence is insufficient to convict, any further prosecution, including an appeal by the prosecution that would lead to a second trial, is prohibited. Even where an acquittal is based on an egregiously erroneous foundation, such as erroneous exclusion of evidence or erroneous weighing of evidence, the acquittal bars appellate review of the ultimate disposition as well as the underlying foundation.

*State v. Blackshere,* 344 S.W.3d 400, 406 (Tex.Crim.App.2011) (citations omitted). That is why constitutional challenges to statutes or ordinances do not result in an acquittal; they result in a dismissal of the prosecution. *See e.g. State v. Stanley,* 201 S.W.3d 754, 759 (Tex.Crim.App.2006) (holding that the Double Jeopardy Clause did not prevent the State's appeal from a dismissal of the charging instrument based upon the argument that the ordinance was unconstitutionally applied to the defendant); *see also Ex parte Chance,* 439 S.W.3d 918 (Tex.Crim.App.2014) (remanding case so that the indictment could be disposed of after granting relief where the defendant had been convicted under an unconstitutional statute); *Ex parte Lo,* 424 S.W.3d 10, 27 (Tex.Crim.App.2013) (finding Section 33.021(b) unconstitutional and remanding the case to the trial court for the dismissal of the indictment); *Cain v. State,* 855 S.W.2d 714, 715 n. 2 (1993) (noting that the proper disposition for a claim that a

statute has been unconstitutionally applied is dismissal of the indictment rather than acquittal); *Johnson v. State*, 755 S.W.2d 92, 98 (Tex.Crim.App.1988), *aff'd*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (remanding flag-burning case for dismissal of charging instrument after determining that the statute was unconstitutional as applied to the defendant).

Appellate courts look to the substance of the order to determine if it represents "a resolution, correct or not, of some or all of the factual elements of the offense charged." *State v. Moreno*, 294 S.W.3d 594, 598 (Tex.Crim.App.2009) (citing *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)). A court of appeals would have been hard-pressed to address a trial court's order granting the appellants' motions in this case. *Id.* at 601–02 (recognizing that the State is not authorized to appeal a verdict of acquittal after jeopardy has attached). By requesting an order of an acquittal, the appellants never obtained an adverse ruling on the applied challenge to the statute itself. Instead, they obtained denials on their motions for instructed verdicts, which the court of appeals should have regarded on appeal as a challenge to the sufficiency of the evidence. *See e.g. Williams v. State*, 937 S.W.2d 479, 482 (Tex.Crim.App.1996) ("We treat a point of error complaining about a trial court's failure to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence."). I would remand so the court of appeals could do so.

The appellants raise significant concerns about the interplay between a police officer's exercise of his lawful authority under Section 38.15 and a citizen's First Amendment rights. To make sure that all of their legal issues were properly before the trial court, they could have first argued that the State failed to carry its burden to show the police were acting under a duty or authority imposed or granted by law or that they were entitled to an acquittal because their conduct amounted to "speech only," and then arguing, in the alternative, that the prosecution should have been dismissed because the officer's exercise of their lawful authority violated the appellants' First Amendment rights. This would have provided the trial court the opportunity to decide both of the specific issues raised by the appellants: the sufficiency of the evidence and the constitutionality of the statute. TEX.R.APP. P. 33.1 (a)(2). And it would have avoided the confusion that has carried through this case from the trial court to this Court, namely whether the appellants were challenging the evidence or the statute.[3] By combining the two arguments, the appellants requested a judgment of acquittal insulated from appellate review, but doing so carried the risk that their as-applied challenges to the statute were not properly preserved in the trial court. *Freeman v. State*, 340 S.W.3d 717, 730 (Tex.Crim.App. 2011) (holding that defendant failed to preserve the constitutional claims he had raised in two pre-trial motions because he merely requested an acquittal in a motion for a directed verdict at the trial court level). Even assuming that the trial court's denial of the appellants" requests for acquittals implicitly covered both claims, the court of appeals should have still addressed first the denial of their motions for an instructed verdict because they afforded the greatest possible relief.[4]

3. The majority notes that the appellants' arguments have been the same since "day one." Yes they have, and that is why this case has been confusing from "day one."

4. It would also avoid the paradox inherent in the court of appeals holding that the statute was unconstitutionally applied because it violated the appellants' First Amendment rights. The court of appeals rejected the State's argument that the statute was being applied to

Because the appellants obtained an adverse ruling only on their request for an acquittal, I would remand this case to the court of appeals to analyze the sufficiency of the evidence.

I respectfully dissent.

conduct rather than speech. In order to hold that the statute was unconstitutionally applied to the appellants, the court of appeals necessarily held as a matter of law that their conduct amounted to speech. Under a proper application of the statute, this would be a defense to conviction. *Duncantell*, 230 S.W.3d at 843–44. So the court of appeals seems to have effectively held that the statute was unconstitutional as applied to the appellants without properly applying the statute in the first place. *Cf. City of Houston, Texas v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (holding municipal ordinance, the enforceable portions of which criminalized "verbal interruptions of police officers," violated the First Amendment).